UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EDWARD DAYAN,

                                   Plaintiff,

           vs.

ELIE LEVY, MICHAEL KASSIN,
SPORTLIFE BRANDS, LLC, and
BLACKVIEW CAPITAL, LLC,

                                   Defendants.

Case No. 23-cv-00113

**ANSWER AND
COUNTERCLAIMS**

*JURY TRIAL DEMANDED*

Defendants/Counterclaim-Plaintiffs SportLife Brands, LLC (the "Company"), Blackview Capital, LLC ("Blackview"), Elie Levy ("Levy"), and Michael Kassin ("Kassin") (collectively, "Defendants" or "Counterclaim-Plaintiffs"), as and for their Answer to the Complaint dated January 7, 2023, filed by Plaintiff/Counterclaim-Defendant Edward Dayan ("Dayan"), respond and allege as follows:

## Jurisdiction and Venue

1.      The allegations in paragraph 1 under the "Jurisdiction and Venue" subheading of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

2.      The allegations in paragraph 2 under the "Jurisdiction and Venue" subheading of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

3.      The allegations in paragraph 3 under the "Jurisdiction and Venue" subheading of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

## Parties

1.      Defendants lack knowledge or information sufficient to admit or deny allegations concerning Dayan's residence in paragraph 1 under the "Parties" subheading of the Complaint. Defendants admit that Dayan was issued a 32% interest in the Company pursuant to the Term Sheet (defined *infra*); however, Defendants deny that Dayan continues to hold such interest.

2.      Defendants admit the allegations contained in paragraph 2 under the "Parties" subheading of the Complaint.

3.      Defendants admit the allegations contained in paragraph 3 under the "Parties" subheading of the Complaint.

4.      Defendants admit the allegations contained in paragraph 4 of the Complaint.

5.      Defendants admit the allegations contained in paragraph 5 of the Complaint.

6.      Defendants admit the allegations contained in paragraph 6 of the Complaint.

7.      Defendants admit the allegations contained in paragraph 7 of the Complaint.

8.      No response to the allegations in paragraph 8 is required.

9.      Defendants admit that Dayan was issued a 32% interest in the Company pursuant to that certain binding term sheet dated October 29, 2018, as amended, by and between the Company, Blackview, Levy, Dayan, and Kassin (the "Term Sheet"), concerning, *inter alia*, the purchase of membership interests and employment with the Company, and respectfully refer the Court to the Term Sheet for a true and complete statement of its contents in response to the remaining allegations contained in paragraph 9 of the Complaint.

10.     Defendants admit that Blackview loaned $300,000 to Dayan and respectfully refer the Court to the Term Sheet and that certain promissory note dated October 19, 2018 made by Dayan to Blackview, as amended (the "Promissory Note"), and affirmatively aver that the maturity date thereunder was extended beyond two (2) years.

2

11.     Defendants admit the allegations contained in paragraph 11 of the Complaint, and respectfully refer the Court to the Term Sheet for a true and complete statement of its contents.

12.     Defendants admit the allegations contained in paragraph 12 of the Complaint, and respectfully refer the Court to the Term Sheet for a true and complete statement of its contents.

13.     Defendants deny the allegations contained in paragraph 13 of the Complaint, and respectfully refer the Court to the Term Sheet for a true and complete statement of its contents.

14.     Defendants deny the allegations contained in paragraph 14 of the Complaint, and respectfully refer the Court to the Term Sheet for a true and complete statement of its contents.

15.     Defendants deny the allegations contained in paragraph 15 of the Complaint, and respectfully refer the Court to the Term Sheet for a true and complete statement of its contents.

16.     Defendants admit that Dayan and Defendants executed a written amendment to the Term Sheet on or about March 6, 2020, and respectfully refer the Court to the document for a true and complete statement of its contents in response to the remaining allegations contained in paragraph 16 of the Complaint.

17.     Defendants deny the allegations contained in paragraph 17 of the Complaint.

18.     Defendants deny the allegations contained in paragraph 18 of the Complaint.

19.     Defendants deny the allegations contained in paragraph 19 of the Complaint.

20.     Defendants deny the allegations contained in paragraph 20 of the Complaint.

21.     Defendants deny the allegations contained in paragraph 21 of the Complaint.

22.     Defendants lack knowledge or information sufficient to admit or deny the allegations contained in paragraph 22 of the Complaint concerning Dayan's overall use of his Gmail account, except deny the allegations with respect to "non-SBL business ventures."

23.     Defendants deny the allegations contained in paragraph 23 of the Complaint.

24.     Defendants admit that counsel sent Plaintiff a letter dated January 5, 2023, on behalf of the Company, and Defendants respectfully refer the Court to the letter for a true and complete statement of its contents in response to the allegations contained in paragraph 24 of the Complaint.

25.     Defendants admit that counsel sent Dayan a letter dated January 5, 2023, on behalf of the Company, and Defendants respectfully refer the Court to the letter for a true and complete statement of its contents in response to the allegations contained in paragraph 25 of the Complaint.

26.     Defendants lack knowledge or information sufficient to admit or deny the allegations concerning the number of emails maintained in "Plaintiff's G-mail folders," and deny the remaining allegations contained in paragraph 26 of the Complaint.

27.     Defendants lack knowledge or information sufficient to admit or deny the allegations concerning Dayan's mental impressions, and deny the remaining allegations contained in paragraph 27 of the Complaint.

28.     Defendants deny the allegations contained in paragraph 28 of the Complaint.

29.     Defendants admit that no notice of breach was delivered to Dayan prior to the termination and deny the balance of the allegations contained in paragraph 29 of the Complaint.

30.     Defendants deny the allegations contained in paragraph 30 of the Complaint.

31.     Defendants deny the allegations contained in paragraph 31 of the Complaint.

32.     Defendants deny the allegations contained in paragraph 32 of the Complaint.

33.     Defendants deny the allegations contained in paragraph 33 of the Complaint.

34.     Defendants deny the allegations contained in paragraph 34 of the Complaint.

35.     Defendants deny the allegations contained in paragraph 35 of the Complaint.

36.     Defendants deny the allegations contained in paragraph 36 of the Complaint.

37.     Defendants deny the allegations contained in paragraph 37 of the Complaint.

38.     Defendants deny the allegations contained in paragraph 38 of the Complaint.

39.     Defendants deny the allegations contained in paragraph 39 of the Complaint.

40.     Defendants deny the allegations contained in paragraph 40 of the Complaint.

41.     Defendants deny the allegations contained in paragraph 41 of the Complaint, except admit that Dayan defaulted on the loan, and counsel for Blackview sent notice thereof.

**FIRST CAUSE OF ACTION**
(Violation of Stored Communications Act 18 USC § 2701 et seq)

42.     Defendants repeat and reallege their prior responses and allegations as if fully set forth herein in response to paragraph 42 of the Complaint.

43.     Defendants deny the allegations contained in paragraph 43 of the Complaint.

44.     The allegations contained in paragraph 44 of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

45.     The allegations contained in paragraph 45 of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

46.     The allegations contained in paragraph 46 of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

47.     Defendants deny the allegations contained in paragraph 47 of the Complaint.

48.     Defendants deny the allegations contained in paragraph 48 of the Complaint.

49.     Defendants deny the allegations contained in paragraph 49 of the Complaint.

50.     Defendants deny the allegations contained in paragraph 50 of the Complaint.

51.     Defendants deny the allegations contained in paragraph 51 of the Complaint.

52.     Defendants deny the allegations contained in paragraph 52 of the Complaint.

53.     The allegations contained in paragraph 53 of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

54.     The allegations contained in paragraph 54 of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

55.     The allegations contained in paragraph 55 of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

56.     The allegations contained in paragraph 56 of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

## SECOND CAUSE OF ACTION
(Computer Fraud and Abuse Act 18 U.S.C. § 1030 et seq).

57.     Defendants repeat and reallege their prior responses and allegations as if fully set forth herein in response to paragraph 57 of the Complaint.

58.     Defendants deny the allegations contained in paragraph 58 of the Complaint.

59.     The allegations contained in paragraph 59 of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

60.     The allegations contained in paragraph 60 of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

61.     The allegations contained in paragraph 61 of the Complaint state legal conclusions, to which Defendants need not respond. To the extent any response to those allegations is necessary, Defendants deny them.

62.     Defendants deny the allegations contained in paragraph 62 of the Complaint.

63.     Defendants deny the allegations contained in paragraph 63 of the Complaint.

64.     Defendants deny the allegations contained in paragraph 64 of the Complaint.

65.     Defendants deny the allegations contained in paragraph 65 of the Complaint.

66.     Defendants deny the allegations contained in paragraph 66 of the Complaint.

67.     Defendants deny the allegations contained in paragraph 67 of the Complaint.

68.     Defendants deny the allegations contained in paragraph 68 of the Complaint.

### THIRD CAUSE OF ACTION
(Breach of Contract)

69.     Defendants repeat and reallege their prior responses and allegations as if fully set forth herein in response to paragraph 69 of the Complaint.

70.     Defendants admit that Dayan was issued a 32% interest in the Company pursuant to the Term Sheet, concerning, inter alia, the purchase of membership interests and employment with the Company, and respectfully refer the Court to the Term Sheet for a true and complete statement of its contents in response to the remaining allegations contained in paragraph 70 of the Complaint.

71.     Defendants admit that Blackview loaned $300,000 to Dayan and respectfully refer the Court to the Term Sheet and the Promissory Note for a true and complete statement of their contents, and affirmatively aver that the maturity date of the Promissory Note was extended beyond two (2) years.

72.     Defendants admit the allegations contained in paragraph 72 of the Complaint, and

respectfully refer the Court to the Term Sheet for a true and complete statement of its contents.

73.     Defendants deny the allegations contained in paragraph 73 of the Complaint, and respectfully refer the Court to the Term Sheet for a true and complete statement of its contents.

74.     Defendants deny the allegations contained in paragraph 74 of the Complaint.

75.     Defendants admit that counsel sent Dayan a letter dated January 5, 2023, on behalf of the Company, and Defendants respectfully refer the Court to the letter for a true and complete statement of its contents in response to the allegations contained in paragraph 75 of the Complaint.

76.     Defendants admit that counsel sent Dayan a letter dated January 5, 2023, on behalf of the Company, and Defendants respectfully refer the Court to the letter for a true and complete statement of its contents in response to the allegations contained in paragraph 76 of the Complaint.

77.     Defendants lack knowledge or information sufficient to admit or deny the allegations concerning Dayan's mental impressions, and deny the remaining allegations contained in paragraph 77 of the Complaint.

78.     Defendants deny the allegations contained in paragraph 78 of the Complaint.

79.     Defendants admit that no notice of breach was delivered to Dayan prior to the termination and deny the balance of the allegations contained in paragraph 79 of the Complaint.

80.     Defendants deny the allegations contained in paragraph 80 of the Complaint.

81.     Defendants admit the allegations contained in paragraph 81 of the Complaint.

82.     Defendants deny the allegations contained in paragraph 82 of the Complaint.

## **GENERAL DENIALS**

83.     Unless specifically admitted above, Defendants generally deny the Complaint as a whole, as well as each and every allegation therein. Defendants furthermore generally deny that Dayan is entitled to judgment in his favor, nor is Dayan entitled to any relief, including any of the

specific relief requested in the "Prayer for Relief" of the Complaint.

## AFFIRMATIVE DEFENSES AND
## <u>RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES</u>

84.     Defendants reserve the right to amend their answer to add affirmative defenses when and if, in the course of its investigation, discovery, or preparation for trial it may become appropriate to assert such additional affirmative defenses. In asserting affirmative defenses, Defendants do not assume the burden of proof for any issue that would otherwise rest on the Plaintiff Edward Dayan ("Dayan" or "Plaintiff") at trial.

### FIRST AFFIRMATIVE DEFENSE.

85.     The Complaint should be dismissed, in whole or in part, for failure to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE.

86.     The Complaint should be dismissed based upon Dayan's prior breach of the Term Sheet.

### THIRD AFFIRMATIVE DEFENSE.

87.     The Complaint should be dismissed based upon Dayan's repudiation of the Term Sheet.

### FOURTH AFFIRMATIVE DEFENSE.

88.     The Complaint should be dismissed, in whole or in part, based upon prior compromise and settlement or accord and satisfaction.

### FIFTH AFFIRMATIVE DEFENSE.

89.     Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, waiver, and estoppel.

### SIXTH AFFIRMATIVE DEFENSE.

90.     Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations and/or filing periods.

### SEVENTH AFFIRMATIVE DEFENSE.

91.     Plaintiff's claims are barred, in whole or in part, by the statute of frauds.

### EIGHTH AFFIRMATIVE DEFENSE.

92.     The Complaint is barred, in whole or in part, by the doctrine of *in pari delicto*.

### NINTH AFFIRMATIVE DEFENSE.

93.     The Complaint is barred, in whole or in part, by the doctrine of unclean hands.

### TENTH AFFIRMATIVE DEFENSE.

94.     The Complaint is barred, in whole or in part, for failure of consideration.

### ELEVENTH AFFIRMATIVE DEFENSE.

95.     The Complaint should be dismissed, in whole or in part, based on the express terms of the Term Sheet.

### TWELFTH AFFIRMATIVE DEFENSE.

96.     The Counterclaim should be dismissed, and sums demanded thereon reduced, in whole or in part, based on setoff or recoupment.

### THIRTEENTH AFFIRMATIVE DEFENSE.

97.     The Complaint, including monetary relief, attorneys' fees and costs sought therein, is barred, in whole or in part, by the terms of the Term Sheet.

### FOURTEENTH AFFIRMATIVE DEFENSE.

98.     The Complaint is barred, in whole or in part, by prevention of performance and frustration of the purpose of the Term Sheet.

### FIFTEENTH AFFIRMATIVE DEFENSE.

99.     The Complaint is barred, in whole or in part, because Dayan's retention of any benefit would result in unjust enrichment.

### SIXTEENTH AFFIRMATIVE DEFENSE.

100.    The Complaint is barred, in whole or in part, by Dayan's own acts or omissions in hindrance and prevention of performance.

### SEVENTEENTH AFFIRMATIVE DEFENSE.

101.    The Complaint is barred, in whole or in part, by the doctrine of parole evidence.

### EIGHTEENTH AFFIRMATIVE DEFENSE.

102.    The Complaint should be dismissed, in whole or in part, for Dayan's breach of the implied covenant of good faith and fair dealing.

### NINETEENTH AFFIRMATIVE DEFENSE.

103.    The Complaint should be dismissed, in whole or in part, because Dayan consented to the access of which he now complains. Dayan independently and voluntarily caused his personal Gmail account to "sync" with the Outlook email client running on his computer and periodically upload the contents of his Gmail account to the Outlook cache residing locally on his Company-issued computer. Dayan consented to access by the Company computer systems upon entering and validating his own Gmail user credentials.

### TWENTIETH AFFIRMATIVE DEFENSE.

104.    The Complaint should be dismissed, in whole or in part, because Dayan has failed to allege any legally cognizable "loss" aggregating at least $5,000 in value within the meaning of the Computer Fraud and Abuse Act.

**TWENTY-FIRST AFFIRMATIVE DEFENSE.**

105.    The Complaint should be dismissed, in whole or in part, because Dayan expressly informed Defendants that he was voluntarily terminating his employment agreement with the Company prior to such time of his receipt of formal notice of termination.

**TWENTY-SECOND AFFIRMATIVE DEFENSE.**

106.    Plaintiff's claims are barred, in whole or in part, because the allegations contained in the Complaint arise out of the Company's regulatory, compliance or other obligation to monitor certain communications and correspondence.

**TWENTY-THIRD AFFIRMATIVE DEFENSE.**

107.    Plaintiff's claims are barred, in whole or in part, because the allegations contained in the Complaint arise out of the Company's maintenance of communications and correspondence in the ordinary course of business.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE.**

108.    Plaintiff is not entitled to any recovery because he has breached his fiduciary duties to the Company.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE.**

109.    Plaintiff's Complaint and the purported causes of action alleged therein suggest an assumption of the risk as to Plaintiff's alleged injuries through his own negligence.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE.**

110.    Plaintiff's Complaint and the purported causes of action alleged therein suggest that Plaintiff consented to the alleged injuries.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE.**

111.    Plaintiff's claims are barred, in whole or in part, because of the illegality of

Plaintiff's conduct, and because the Company has complied with all applicable laws and regulations of the federal and state governments.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE.

112.    The Complaint and each cause of action alleged therein is barred in whole or in part to the extent that Plaintiff lacks standing to assert some or all of the purported causes of action.

### TWENTY-NINTH AFFIRMATIVE DEFENSE.

113.    The damages allegedly suffered by Plaintiff were not the proximate or foreseeable result of acts or omissions of Defendants.

### THIRTIETH AFFIRMATIVE DEFENSE.

114.    Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any damages or legally cognizable injury.

### THIRTY-FIRST AFFIRMATIVE DEFENSE.

115.    The obligation to provide notice of breach for an opportunity to cure implies a condition precedent—that the breach is curable. Plaintiff's claims are barred, in whole or in part, by failure of an implied condition precedent because Plaintiff's breaches under the Term Sheet and Employment Provisions could not be cured.

### THIRTY-SECOND AFFIRMATIVE DEFENSE.

116.    Plaintiff's failure to act in good faith in commencing and prosecuting this action bars him from enforcing any rights he may otherwise have.

### THIRTY-THIRD AFFIRMATIVE DEFENSE.

117.    Plaintiff's alleged damages were caused, in whole or in part, by the culpable conduct of the Plaintiff, which either bars the claims completely or else diminishes the damages by the proportion that such culpable conduct of the Plaintiff bears to the total culpable conduct

causing the damages.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE.

118.    Plaintiff's claims are barred, in whole or in part, because any damages allegedly suffered by Plaintiff were the result of superseding and intervening causes.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE.

119.    To the extent that Plaintiff suffered damages as alleged, such damages were caused or contributed to by the actions of others over whom Defendants exercised no control.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE.

120.    Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to take reasonable steps to mitigate damages and may not recover damages that could have been avoided.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE.

121.    The Complaint should be dismissed for insufficient process and/or insufficient service of process.

## COUNTERCLAIMS

Defendants/Counterclaim-Plaintiffs, by and through their undersigned attorneys, Wachtel Missry LLP, as and for their Counterclaims against Plaintiff/Counterclaim-Defendant, allege, upon knowledge as to themselves and their own acts, and otherwise upon information and belief, as follows:

### Nature of the Action

122.    From the moment he joined the Company, Dayan orchestrated secret, concerted efforts to divert business away from the Company and funnel opportunities presented to him in his capacity as a partner and officer of the Company to and for the benefit of direct competitors controlled by and/or affiliated with Dayan and members of his family.

123.    Dayan proceeded to embed himself as a double agent within the Company, engaging in a clandestine, rampant, years-long scheme, coopting Company employees to do work—knowingly or unknowingly—for his side ventures and produce merchandise for his competing companies, bleeding the Company of resources, and committing numerous breaches of his contractual and common law duties and statutory violations along the way, all in service of the Company's direct competitors.

124.    Believing he was home free after four years of scheming without getting caught, Dayan announced his intention to resign from the Company in or about August 2022 and began to negotiate with Defendants his exit therefrom. Given Dayan's announcement, the Company hired a new sales and merchandising officer, to take over Dayan's role and Dayan was tasked with transitioning his duties and responsibilities to that new officer.

125.    While negotiations with Dayan were coming to a close, evidence of Dayan's malfeasance surfaced on his Company-issued computer. Discovery of this evidence by Defendants

resulted in the cessation of negotiations and termination notice dated January 5, 2023.

126.     Dayan then precipitously commenced this litigation by filing the Complaint, pre-emptively, seeking relief to which he has no entitlement.

127.     As more fully set forth below, Defendants seek damages and to stop Dayan, a former partner and officer of the Company, from causing further injury to the Company by, among other things: (a) diverting and usurping corporate opportunities, (b) violating his contractual obligations, including non-compete and non-solicitation provisions, (c) breaching his fiduciary duties, (d) unfairly competing against the Company, (e) damaging the Company's existing and prospective business relationships, (f) breaching his duty of loyalty owed to the Company and its other members, and (g) misappropriating and using the Company's trade secrets and confidential information.

## The Parties and Jurisdiction

128.     Counterclaim-Plaintiff SportLife Brands LLC (the "Company") is a Delaware limited liability company with a principal place of business in New York.

129.     During the relevant period, the Company had three (3) members: Blackview, Kassin, and Dayan.

130.     Counterclaim-Plaintiff Blackview is a Delaware limited liability company with a principal place of business in New York, New York. Levy is the managing member of Blackview.

131.     Counterclaim-Plaintiff Levy resides in Brooklyn, New York. Levy is a partner and CEO of the Company.

132.     Counterclaim-Plaintiff Kassin resides in Brooklyn, New York. Kassin is a partner and President of the Company.

133.     Counterclaim-Defendant Dayan resides in Brooklyn, New York. During the

relevant period, Dayan joined the Company as a partner and Chief Marketing/Merchandising Officer (CMO)[1] of the Company, overseeing all sales, sourcing, and production of merchandise.

134.    These Counterclaims arise under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, *et seq.*, the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and New York law.

135.    The Court has subject-matter jurisdiction over the federal causes of action (Counts IV and V) pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1836(c) and 15 U.S.C. § 1121(a). The Court has supplemental jurisdiction over the remaining causes of action (Counts I-III, VI and VII) pursuant to 28 U.S.C. § 1367.

136.    The Court has personal jurisdiction over Dayan, who resides in this District, and who, upon information and belief, committed misappropriation and other tortious acts alleged herein within this District.

137.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2), as Dayan resides in this District, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**The Business of SportLife Brands LLC (the "Company")**

138.    The Business and purpose of the Company, as set forth in the Term Sheet, was and is as follows:

> **Purpose**. The purpose of the Company, under the Sportlife Brands tradename, shall be to license, to manufacture (whether through third-party contractors, whether under license or under the Trademark or private label on behalf of others) and to sell underwear, sleepwear, loungewear, and activewear to retailers, e-commerce, wholesalers, and distributors (the "Business"). Licensed underwear, sleepwear, loungewear, and activewear shall be manufactured pursuant to the applicable license agreements for certain brands; as well as act as an agent for the import of underwear,

---

[1] Dayan's title given in the Term Sheet is "Chief Marketing Officer"; he also held himself out as "Chief Merchandising Officer."

sleepwear, loungewear, and activewear and act as an agent for retail underwear, sleepwear, loungewear, and activewear accounts.

139.    Accordingly, during the relevant period, the Company was or is the holder of certain rights to sell, manufacture, and distribute certain trademarked merchandise under licensing agreements with third parties (the "Licensed Brand Agreements"), including, without limitation, the following brands (the "Licensed Brands"): Baby Phat, Capezio, Disney, Eric Carle, Everlast, Greg Norman, Head, Isotoner, Joseph Abboud, "The Macbeth Collection" and "Candie Couture" by Margaret Josephs, Marvel, NASA, Nautica, Penn, Prince, Real Tree, Sean John, Starter Black, Starter Black/Starter Core - Europe, Tahari, Tapout, Tony Hawk, Tootsie Roll, and Umbro Premier.

140.    The Company is also the owner of the SPORTLIFE BRANDS mark, alone or with other elements or designs, including U.S. Trademark Registration Nos. 5,598,400 and 5,598,401 (the "SportLife Marks").

141.    SportLife Marks may appear alone on SportLife-branded merchandise, or on packaging and promotional materials in conjunction with Licensed Brands on merchandise produced under license or other arrangement (*e.g.*, the Company may be identified as the distributor on packaging of Nautica thermal underwear produced under agreement with the licensor).

142.    As Dayan was well aware, the Company invested considerable time and resources in securing these third-party contracts, licensed brand assets, and its own intellectual property.

**Dayan Joins the Company as a Partner and CMO**

143.    Dayan, Blackview, Levy, Kassin, and the Company (each a "Party," collectively, the "Parties") entered into that certain binding term sheet dated October 29, 2018 (the "Term Sheet"), concerning the purchase of membership interests in, general business operations of, and employment with the Company, among other things.

144.    Upon execution of the Term Sheet and consummation of various transactions contemplated thereunder, membership interests in the Company were held as follows: Blackview (46%), Dayan (32%), and Kassin (22%).

145.    As set forth in the Term Sheet, the Parties agreed that the Company would be controlled by the Board of Managers, comprised of three (3) manager-designees appointed by each of the Company's three members to vote their percentage interests, *viz.*, Levy was made the designee to vote Blackview's 46% interest, Dayan to vote Dayan's 32% interest, and Kassin to vote Kassin's 22% interest.

146.    Under the Term Sheet, Board action generally requires approval of the Board of Managers representing 68% or more of the Company's aggregate interests.

147.    "Major Decisions," however, require the unanimous consent of the Board of Managers, including, by way of example, the following: (1) approving or modifying the Company's annual budget, (2) incurring capital expenditures, guarantees, leases, financing or loans that deviate by more than 10% from the approved budget, (10) entering into any license agreement requiring guaranteed royalties in excess of $50,000 per annum, (11) causing the Company to enter into any affiliate transactions, (13) causing the disposition, hypothecation or other transfer of assets of the Company outside of the ordinary course of business, (14) entering into any joint venture, (15) changing the Company's purpose, (16) possessing, assigning, or using any funds or other property of the Company in excess of $500 for anything other than the Company purpose, (17) approving any shipment over $25,000 (or cumulative exposure at any one time of $50,000) that is not approved by the Company's factor, and (19) making any purchases over $50,000 outside of the ordinary course of business.

**Non-Compete, Non-Solicitation, and Right of First Offer for Closely Related Business**

148.    The Term Sheet contains a provision prohibiting competition with the Business of the Company and solicitation of the Company's employees or contractors, as well as requiring that the Company be presented with the right of first offer with respect to opportunities to do business closely related to the existing Business of the Company:

> Non-Compete; Non-solicitation. Levy, [Dayan], and [Kassin] hereby agree that none of their businesses compete with respect to the Business the Company is engaged as of the Closing. For the sake of clarity, [Dayan] and [Kassin] are aware that GoldView Capital, an affiliate of Levy, owns a bath, beauty, and cosmetics business, which, as of the date of this Agreement, does not violate this non-compete provision. Levy, [Dayan], and [Kassin] each agree that for long as they or one of the Permitted Transferees are a member of the Company, and for a period of three years thereafter, they shall not directly or indirectly compete with the Business of the Company or solicit the employees or independent contractors of the Company.
>
> In the event any member is presented with an opportunity to enter into a closely related business such as cold weather, bags, footwear, active accessories, or tech accessories, such member shall give the Company the right of first offer.

Term Sheet, p. 5 (the "Restrictive Provisions").

149.    Under the Restrictive Provisions, Dayan was expressly required to first present to the Company any opportunity not only with respect to the Company's Business in underwear, sleepwear, activewear, and loungewear, but also any closely related business, such as cold weather, bags, footwear, active accessories, or tech accessories (all goods subject to the Restrictive Provisions, collectively, "Company Merchandise").

**The Employment Agreements**

150.    The Term Sheet furthermore specified certain terms of employment with the Company:

> Employment Agreements. [Dayan] and [Kassin] understand that

20

they occupy full-time positions in the Company and shall render services to the Company on a full-time basis. Levy shall devote substantially all of his business time and necessary efforts and energy to the performance of his employment responsibilities. Employment agreements between (i) [Dayan] and the Company, and (ii) [Kassin] and the Company shall be negotiated in good faith to reflect the terms of this term sheet and Exhibit B (*sic*) herein (the "Employment Agreements"). It is the intention that this term sheet shall be binding on the parties hereto until a definitive Operating Agreement is executed by the parties hereto. It is the intention that this term sheet shall be binding on the parties hereto until a definitive Employment Agreement is executed by the parties hereto and until a definitive agreement is entered into shall be the Employment Agreement between the Company and the employees.

Term Sheet, p. 5 (the "Employment Provisions").

151.    The Employment Agreements annexed to the Term Sheet specified job titles and roles as follows:

        a.    Levy, as CEO, was responsible for licensing and acquisition of business, and generally managing and devising the overall business strategy for the Company.

        b.    Dayan, as CMO, was responsible for selling and sourcing inventory.

        c.    Kassin, as President, was responsible for overseeing the Company's finances and general administration of Company operations.

152.    The Employment Agreements further specified the following compensation and bonus structure:

        a.    Levy received an annual base salary of $350,000, Dayan received an annual base salary of $275,000, and Kassin received an annual base salary of $215,000.

        b.    For every year in which the Company's EBITDA (earnings before interest, taxes, depreciation, and amortization) exceeded $2,500,000, Levy would receive a bonus of $150,000, Dayan would receive a bonus of $100,000, and Kassin would receive a bonus of $50,000.

153.    Under the Employment Agreements, Dayan and Kassin "shall be full-time employees in running the day-to-day business and may only be terminated For Cause (as that term is defined below) or voluntary resignation."

154.    Termination "For Cause" thereunder is defined as follows: "(i) conviction or guilty plea of any felony; (ii) conviction or guilty plea of fraud or embezzlement of Company property or assets; or (iii) willful and continued failure to render services hereunder substantially on a fulltime basis for a period of thirty (30) consecutive days which failure remains uncured for ten (10) business days after written notice of such breach (other than any such failure resulting from such officer's incapacity due to physical or mental illness or vacation in accordance with the terms hereof)[.]"

**<u>Dayan's Unlawful Schemes</u>**

155.    From the moment he joined the Company, Dayan willfully and surreptitiously engaged in numerous unlawful schemes in breach of his contractual and other legal duties and obligations.

156.    Dayan competed with the Company in virtually every aspect of the Company's Business: as a sourcing agent on behalf of competitors, as a retail agent on behalf of competitors, and as an unauthorized reseller of merchandise produced by and for the Company, illegally obtained by Dayan, and which Dayan nefariously and deliberately misappropriated and diverted to and for the benefit of himself and/or his Affiliates.[2]

157.    The Company's Business includes, generally, all sales of Company Merchandise to

---

[2] As used herein, the term "Affiliates" refers to and includes, without limitation, Dayan family members (including Dayan's brother, Seymour Dayan) and entities financed by, affiliated or associated with, or otherwise under the direct or indirect control of Dayan and/or Dayan family members, including, without limitation and by way of example, Merch Biz Inc., Gilbar Trading, Inc. d/b/a Sketch 36 d/b/a Gilbar Factors, Apparel Connection LLC d/b/a ACNY Group, and CAA/Gear Up.

retailers, e-commerce, wholesalers, and distributors. Because the Company's Business includes acting as agent for the import of Company Merchandise, as well as acting as agent for the sale of Company Merchandise to retail accounts, Dayan's collection of commissions for acting as agent for competing business in the same capacity is squarely within and prohibited by the Term Sheet non-compete clause.

**A.      Sourcing Agent for Competitors**

158.    At the time he signed the Term Sheet—covenanting not to compete with the Company—Dayan was acting as sourcing agent for National Mill Industry, Inc. d/b/a Carnival Creations, successfully procuring for them in excess of $100,000 worth of orders to manufacture and import competing product (men's underwear), for which Dayan was paid on a commission-basis based on a percentage of revenues.

159.    Acting as an agent to produce and import competing Company Merchandise increases the supply of those products for sale to consumers in the marketplace, impacting price and reducing the Company's market share to the detriment of the Company.

160.    Dayan nevertheless deliberately used his knowledge of Company practices and contacts from doing Company Business to facilitate the production and import of competing merchandise for the benefit of himself and his Affiliates.

161.    In 2021, Dayan recruited a Company supplier located in Pakistan, and procured competing Company Merchandise (thermal underwear and base layers) for import and sale by and on behalf of Affiliates "ACNY Group" and/or "Sketch."

**B.      Retail Agent for Competitors**

162.    The Company's Business also includes sales of Company Merchandise directly to retailers (the "Retail Partners"), such as, without limitation, Gabe's, Beall's, Boscov's, Macy's,

Nordstrom Rack, Saks Off 5th, The TJX Companies, Inc., Burlington, Ross, Costco, Dick's Sporting Goods, Walmart, Amazon, Big Lots, Dollar General, and Family Dollar, among others.

163.    Servicing and selling Company Merchandise to Retail Partners was one of Dayan's core responsibilities. During his tenure as CMO, Dayan's communications concerning Company Merchandise should have been made for and on behalf of the Company to comply with the Restrictive Provisions, among other things.

164.    In 2019, Dayan procured 400,000 units of competing Company Merchandise for sale to National Stores, Inc.

165.    At no time did Dayan ever disclose the existence of this business opportunity to the Company or any of the Defendants, nor did Dayan ever disclose any actual or intended payment of commissions for acting as an agent on this deal or any other transaction.

166.    In 2020, Dayan procured competing Company Merchandise from East West U.S.A., which he then sold to various Retail Partners (including Gabe's, Beall's, and Big Lots) for sales commissions paid to him by East West U.S.A.

167.    Again, Dayan neither disclosed this opportunity to any of the Defendants, nor did he ever present or offer it to the Company.

168.    In 2020, Dayan solicited Family Dollar to buy competing Company Merchandise from Dayan's Affiliate, ACNY.

169.    Despite his knowledge of the Company's contractual obligations under Licensed Brand Agreements and requirements imposed by third-party licensors, Dayan presented *his Affiliate* for production of cold weather apparel under a Licensed Brand (Mossy Oak) for sale to Family Dollar, one of the Company's biggest Retail Partners.

170.    In 2020, Dayan offered competing Company Merchandise for sale to Retail Partner,

24

Beall's, causing Beall's to later issue purchase orders for competing Company Merchandise to and for the benefit of his Affiliate, "Sketch," rather than the Company.

171.    Dayan's attempts to sell competing Company Merchandise to Beall's *for his Affiliate* rather than the Company confused the Beall's representative, who indicated to Dayan that the Company (not Dayan's Affiliate) was the only vendor recognized by their system for purposes of processing the transaction.

172.    In 2020, Dayan sought to sell competing Company Merchandise to Retail Partners Gabe's and Wal-Mart on behalf of his Affiliates, including Gilbar Trading d/b/a Sketch.

173.    For example, Dayan offered 1,000,0000 units of competing Company Merchandise (sleep pant) for sale by his Affiliate to Gabe's in or around the first and second quarters of 2020.

174.    Dayan subsequently continued to receive multiple purchase orders through year-end 2020 for competing Company Merchandise from Gabe's, all of which were done as sales for and on behalf of his Affiliate, "Sketch."

C.    **Coopted Company Employees and Resources**

175.    In addition to misrepresenting what he was doing to supply chain professionals he dealt with along the way, Dayan coopted and caused Company staff, wittingly or unwittingly, to provide substantial assistance to him in concealing and closing his illicit business transactions.

176.    Dayan enlisted his assistant and Company employee, Patricia "Trish" Albano, to perform administrative tasks for illicit sales and competitive business done for Dayan and his Affiliates.

177.    Dayan furthermore instructed or informed Ms. Albano that such activities were not to be done on Company email, but only through Dayan and Ms. Albano's personal email accounts.

178.    In or around fourth quarter 2020 and first quarter 2021, Dayan instructed Company

employee and designer, Maria Williams, to design a line of Cherokee branded loungewear and underwear for Dayan and/or his Affiliate.

179.     There is no record of the goods associated with these designs being used or sold by the Company. Upon further inquiry, Ms. Williams could provide no explanation other than that, as an employee of the Company, she did as she was instructed by Dayan, the CMO of the Company.

**D.     Stolen Company Merchandise**

180.     Dayan also converted Company Merchandise to and for the benefit of himself and his Affiliates.

181.     Dayan willfully caused the Company to overproduce Company Merchandise, saddling the Company with the expense of producing and storing large quantities of goods that Dayan had no intention of selling for or on behalf of the Company. Rather, Dayan used his position as partner and CMO of the Company to take possession of Company Merchandise—that Dayan deliberately caused the Company to overproduce, at the Company's expense—for and on behalf of himself and his Affiliates, as part of their scheme to convert and sell Company Merchandise produced at no cost to Dayan or his Affiliates.

182.     In 2020, for example, using Dayan's position as partner and CMO of the Company, Dayan and/or his Affiliates wrongfully took possession of certain Nautica-branded Company Merchandise, which had been manufactured and paid for by the Company, and for which the Company holds the exclusive right to produce and sell under the applicable Licensed Brand Agreements.

183.     Dayan and his Affiliates then deliberately marketed Company Merchandise— which they had no right to possess, own, or control for themselves—for sale to an unauthorized distribution channel, to avoid being caught selling unauthorized goods in authorized channels.

184.    Under scrutiny from the unauthorized distribution channel to whom Dayan sought to sell unauthorized Licensed Branded goods, Dayan and his Affiliates furthermore falsely represented Dayan's legal authority to grant a "release" of the Licensed Brand goods, which he had no right to do.

### Dayan's Voluntary Resignation from the Company

185.    From the time that Dayan joined the Company in 2018, and each year thereafter, the Company failed to meet its projected financial targets.

186.    In late August 2022, Dayan told Levy and Kassin of his intention to exit from the Company.

187.    On or about September 8, 2022, the Company introduced Moey Shabot ("Shabot") as the new President of Sales & Merchandising, taking over Dayan's role and duties. While Shabot was transitioning into the new role, Dayan continued to be employed by and performed work for the Company.

188.    During this time, Dayan's negotiations with Defendants over the terms of his exit, including, specifically, the sale and determination of value of his 32% membership interest in the Company, were ongoing.

189.    On or about December 30, 2022, the Company's IT manager exported a copy of the Outlook cache residing locally on Dayan's Company-issued computer.

190.    Consistent with the Company's past practices in transitioning work performed by departing employees, the contents of Dayan's Company-issued computer and email account were copied for preservation and continuity.

191.    As evidence of the foregoing misconduct by Dayan surfaced on his Company-issued computer, Defendants ceased negotiations with Dayan.

192.     By letter dated January 5, 2023, the Company notified Dayan of his breaches, which were incurable, and termination for cause.

## COUNT I.
### Breach of Contract

193.     Counterclaim-Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

194.     The Term Sheet is a contract.

195.     Counterclaim-Plaintiffs fully performed their obligations under the Term Sheet.

196.     Dayan's breaches of the Term Sheet include, without limitation:

a.     Competing with the Company in breach of the Restrictive Provisions;

b.     Soliciting employees and contractors of the Company in breach of the Restrictive Provisions;

c.     Failing to provide the Company with the right of first offer on opportunities to do closely related business in breach of the Restrictive Provisions;

d.     Willfully and continuously failing to render services to the Company substantially on a full-time basis for a period of thirty (30) consecutive days in breach of the Employment Provisions;

e.     Causing the Company to enter into or facilitate business and transactions without requisite Board approval in breach of the requirements for Major Decisions;

197.     The above-referenced breaches of the Term Sheet are material and continuing.

198.     Dayan was on notice of the nature and extent of his breaches and for-cause termination by letter sent on behalf of Counterclaim-Plaintiffs dated January 5, 2023, at the latest.

199.     At that time, and upon Counterclaim-Plaintiffs' discovery of Dayan's breaches, Dayan's breaches were incurable.

200.     Any opportunity to cure was made futile and/or prevented by Dayan's own acts and omissions, including his preemptory voluntary resignation from the Company, among other things.

201.     As a direct result of Dayan's breach of contract, Counterclaim-Plaintiffs have suffered damages in an amount to be determined at trial, including, without limitation, damages resulting from lost revenues and profits resulting from Dayan's conduct.

202.     Because Dayan has been in continuous breach of the aforesaid Restrictive Provisions, the term of the restrictions has not run.

203.     Dayan's breaches have caused and continue to cause irreparable harm to the Company.

204.     In addition to monetary damages, which are inadequate to fully redress the harm caused by Dayan, Counterclaim-Plaintiffs are entitled to entry of a court order: (a) enjoining Dayan from further and/or continued breaches of the Term Sheet, and (b) specifically enforcing the Restrictive Provisions of the Term Sheet against Dayan.

**COUNT II.**
**Breach of Fiduciary Duty**

205.     Counterclaim-Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

206.     As a business partner, employee, and officer of the Company, Dayan occupied a position of trust and confidence with the Company, as well as with Levy, Blackview, and Kassin.

207.     By virtue of these roles, Dayan owed fiduciary duties, including a duty of loyalty, to Counterclaim-Plaintiffs.

208.     Dayan breached his fiduciary duties by, *inter alia*: (a) usurping and diverting opportunities of the Company; (b) competing with the Company and Counterclaim-Plaintiffs while still a member of and employed by the Company; (c) using Company resources and employees to

29

facilitate his improper competition; (d) improperly accessing, using, and removing confidential, proprietary, and trade secret information belonging to the Company for use by Dayan and his Affiliates to improperly compete with the Company; (e) soliciting Retail Partners and customers, vendors, suppliers, independent contractors and employees of the Company to do business with or for Dayan and his Affiliates; and (f) misappropriating, improperly using and failing to guard and protect the confidential information of the Company.

209.    Dayan carried out these breaches of fiduciary duty in secrecy and without the knowledge or consent of the Company, Blackview, Levy, or Kassin.

210.    As a fiduciary, Dayan should have disclosed and obtained consent for each of these acts (to which the Company, Blackview, Levy, and Kassin would never have agreed).

211.    By engaging in the acts described above, Dayan abused his position of trust and confidence and furthered the interests of himself and his Affiliates at the expense of the Company, Blackview, Levy, and Kassin.

212.    Dayan's breaches have caused and continue to cause irreparable harm to the Company.

213.    As a direct result of Dayan's breach of his fiduciary duties, Counterclaim-Plaintiffs have suffered monetary damages as a result, including without limitation lost profits and revenues, in an amount to be determined at trial.

214.    Under the faithless servant doctrine, Counterclaim-Plaintiffs are entitled to disgorgement and restitution of all compensation provided to Dayan during the period of his disloyalty.

215.    Dayan acted in an egregious, malicious, willful, and wanton manner, and in bad faith when committing the above-referenced acts and omissions. As a result, Counterclaim-

Plaintiffs are entitled to punitive damages.

216.    Accordingly, Dayan breached fiduciary duties owed to Counterclaim-Plaintiffs, who are entitled to injunctive relief, compensatory, and exemplary damages in amounts to be determined at trial.

## COUNT III.
### Tortious Interference with Contractual Relations

217.    Counterclaim-Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

218.    The Company entered into Licensed Brand Agreements with third parties with respect to sales of Company Merchandise produced under or in connection with the Licensed Brands.

219.    Dayan had knowledge and notice of the Company's obligations to said third parties under the Licensed Brand Agreements, including without limitation the Company's right to use certain trademarks and intellectual property for the production and sale of merchandise bearing the Licensed Brands.

220.    The Company would have honored and performed the Licensed Brand Agreements, but for Dayan intentionally causing their breach, resulting in significant damages.

221.    While the amount of damages will be determined at trial, the Company is entitled to recover: (i) the full amount of pecuniary loss of the benefits it bargained for under the contract; (ii) consequential losses, including loss of goodwill and loss of past and future profits and revenues, that Dayan's interference legally caused; and (iii) for actual harm to their reputation, a reasonably expected result of Dayan's interference.

222.    In committing the above-referenced acts and omissions, Dayan acted in a malicious, egregious, willful, and wanton manner, with bad faith and a conscious and deliberate disregard of

the interests of the Company.

223.    As a result, Counterclaim-Plaintiffs are entitled to punitive damages in addition to compensatory damages for Dayan's tortious interference.

## COUNT IV.
### Counterfeiting, Infringement, and False Designation of Origin in Violation of the Lanham Act (15 U.S.C. §§ 1114(1), 1125(a))

224.    Counterclaim-Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

225.    The Company is the owner of a valid and legally protectable SportLife Marks, which it has used in commerce continuously since 2017 in connection with the Business of the Company.

226.    As a result of its widespread, continuous, and exclusive use of the SportLife Marks to identify goods and services of the Company as their source, the Company owns valid and subsisting federal statutory and common law rights to the SportLife Marks.

227.    Dayan, for himself and/or his Affiliates, has made unauthorized use of the SportLife Marks in commerce in connection with the distribution, sale, offering for sale, or advertising of goods or services.

228.    The unauthorized use of SportLife Marks is likely to cause consumer confusion in that the public is likely to mistakenly believe that goods and merchandise sold or marketed by Dayan or his Affiliates have been authorized or sponsored by, or are somehow affiliated with, the Company.

229.    The unauthorized use of SportLife Marks furthermore unfairly capitalizes on the goodwill and reputation of the Company and endangers its business relationships with intellectual property owners, licensors, and stakeholders of the Licensed Brands.

230.   Dayan's unauthorized use in commerce as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

231.   The unauthorized use in commerce of spurious designations identical to or substantially indistinguishable from the SportLife Marks, on and in connection with counterfeit goods as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of the counterfeit goods, and is likely to cause consumers to believe, contrary to fact, that such goods are sold, authorized, endorsed, or sponsored by the Company, or that Dayan and/or his Affiliates are in some way affiliated with or sponsored by the Company.

232.   Dayan's conduct constitutes counterfeiting and trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

233.   Upon information and belief, Dayan has committed the foregoing acts of deception, counterfeiting and infringement with full knowledge of the Company's prior rights in the SportLife Marks and with the willful intent to cause confusion and deception in the marketplace, trade on the Company's good will, and divert potential sales and business to Dayan and his Affiliates.

234.   Dayan's conduct is causing immediate and irreparable harm and injury to the Company, and to its goodwill and reputation, and will continue to both damage the Company and confuse the public unless enjoined by this court. The Company has no adequate remedy at law.

235.   The Company is entitled to, among other relief, injunctive relief and an award of actual damages, Dayan's profits, enhanced damages and profits, statutory damages, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116 and 1117, together with prejudgment and post-judgment interest.

## COUNT V.
### Violation of Defend Trade Secrets Act
### (18 U.S.C. § 1836 *et seq.*)

236.     Counterclaim-Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

237.     The Company possesses trade secrets including, but not limited to, Company plans practices, compilations, designs, methods, processes, procedures and programs developed over the years by and through Counterclaim-Plaintiffs' expertise and experience in and related to the Business of the Company, including, *inter alia*, sourcing product supply, import/export and international supply chain and logistics, identifying and selecting suppliers and facilities, utilizing manufacturing and production efficiencies, servicing relationships with Retail Partners, strategic locations and positioning for distribution and quality control, monitoring trends and demand, among other business advantages. This and other information are confidential and proprietary and constitute "Company Trade Secrets."

238.     Company Trade Secrets give the Company a significant advantage over its existing and would-be competitors, an advantage that would be lost if the trade secrets became known to the public or to the Company's competitors.

239.     Company Trade Secrets derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

240.     The Company has made reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets, including designating certain information as confidential, requiring members and employees to sign confidentiality agreements, and restricting access to such information and providing Company-issued computers to employees (including Dayan) so that the Company's confidential information remains on Company devices and network.

241.    Dayan had knowledge of, and access to, Company Trade Secrets.

242.    Dayan was and is under a duty both to keep Company Trade Secrets confidential, and not to use, exploit or divulge such information other than for the benefit of the Company and with its authorization.

243.    Dayan misappropriated Company Trade Secrets for his own gain, without regard to the Company's rights, and without compensation, permission, or license, including the disclosure and/or use of Company Trade Secrets to directly compete with the Company, and has refused to return the Company's confidential and proprietary information and trade secrets.

244.    Dayan's conduct was, is, and remains willful, malicious, wanton, in bad faith, and taken with blatant disregard for the Company's valid and enforceable rights.

245.    As a result of Dayan's misappropriation of Company Trade Secrets, the Company has been and continues to be materially, immediately, and irreparably injured by Dayan's continued wrongful conduct. The Company has suffered irreparable harm as a result of Dayan's conduct and will continue to suffer irreparable harm, which cannot be adequately redressed at law, unless he is enjoined from engaging in any such further conduct.

246.    By reason of the foregoing,  the Company is entitled to damages in an amount to be determined at trial, together with exemplary or punitive damages, and an award of attorneys' fees.

### COUNT VI.
**Misappropriation and Unfair Competition under New York law**

247.    Counterclaim-Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

248.    The acts described above constitute misappropriation and unfair competition in violation of the law of the State of New York. The acts include but are not limited to: (a) breach of

contract, (b) breach of non-competition and confidentiality provisions, (c) breach of fiduciary duty, (d) breach of the duty of loyalty, (e) tortious interference (f) conversion and (g) misappropriation of trade secrets.

249.    The Company invested substantial time, skill, and money in developing its trade secrets and confidential business materials and its customer contacts and goodwill.

250.    Dayan misappropriated and unlawfully used the Company's property by: (a) diverting and usurping the Company's corporate opportunities; (b) using confidential business information about the Company, Business, and prospective business to improperly compete with the Company, all while Dayan was a partner, limited liability company member, board member, officer, and employee of the Company; and (c) improperly soliciting the Company's existing and prospective Retail Partners, customers, manufacturers, suppliers, employees and independent contractors to do business for Dayan and his Affiliates, to the detriment of the Company.

251.    All such acts or omissions were without authorization or consent of the Company.

252.    Dayan's actions were taken with bad faith or intent to injure the Company, including the Company's right to enforce its contracts and preserve its legitimate business interests, and to seek an unfair advantage in competing with the Company.

253.    Dayan's conduct constitutes unfair competition.

254.    As a direct result of Dayan's unfair competition, the Company has suffered damages in an amount to be determined at trial, including but not limited to damages resulting from lost revenues and profits and damage to the Company's good will and reputation in the industry.

255.    Dayan acted in an egregious, malicious, willful, and wanton manner, and in bad faith. As a result, the Company is entitled to punitive damages against Dayan.

256.    As a direct result of Dayan's unfair competition, and unless and until such conduct ceases, the Company will continue to be threatened with and suffer irreparable harm for which the Company possesses no adequate remedy at law.

**COUNT VII.**
**Indemnification**

257.    Counterclaim-Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

258.    The Term Sheet provides: "Each party shall indemnify the others for all actual costs, damages and expenses (including reasonable attorney's fees) suffered by the others as a result of a breach of the aforesaid representations."

259.    As set forth above, Dayan breached numerous representations in the Term Sheet, including without limitation representations made in connection with the Restrictive Provisions and Employment Provisions.

260.    As a result of Dayan's breaches, Counterclaim-Plaintiffs have suffered actual costs, damages and expenses, including without limitation reasonable attorney's fees, which they are entitled to recover.

261.    Accordingly, Counterclaim-Plaintiffs are entitled to indemnification by Dayan for all actual costs, damages and expenses, including reasonable attorney's fees, incurred as a result of Dayan's breaches.

**DEMAND FOR JURY TRIAL**

Defendants/Counterclaim-Plaintiffs demand trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Defendants/Counterclaim-Plaintiffs SportLife Brands, LLC, Blackview Capital LLC, Elie Levy, and Michael Kassin pray for entry of judgment, in their favor and against Plaintiff/Counterclaim-Defendant Edward Dayan, as follows:

(i)   dismissing the Complaint in its entirety, with prejudice;

(ii)   awarding compensatory damages in an amount to be determined at trial but believed to be not less than $7,000,000;

(iii)   awarding exemplary and punitive damages in amounts to be determined at trial;

(iv)   entering a preliminary and permanent injunction: (a) enjoining Dayan from directly or indirectly competing with the Business of the Company or soliciting the employees or independent contractors of the Company for a period of three years from the time that the covenant is adjudicated to run; (b) enjoining Dayan from ever using Company Trade Secrets and confidential, proprietary, or trade secret information or business materials including, but not limited to, Company documents, policies, business plans, client lists, contacts and information, customer relationships, and any other non-public information about the Company; (c) enjoining Dayan from selling or attempting to sell any Company Merchandise or any goods or services created from Company Trade Secrets or the Company's confidential and proprietary information; (d) enjoining Dayan from interfering with the Company's contractual relationships with any current or former customers or other third-party with whom the Company has a business relationship; (e) enjoining Dayan from defaming the Company's good business reputation or any of the Company's clients, services, or products in any manner; and (f) enjoining Dayan from misappropriating, using, disclosing, distributing, or copying any and all Company Trade Secrets or confidential information of the Company obtained by Dayan during or after his

employment with the Company;

   (v)   awarding all costs, including attorneys' fees, expenses, and disbursements

incurred;

   (vi)   awarding pre- and post-judgment interest;

  (vii)   together with such other and further relief as the Court may deem just, equitable,

and proper.

Dated:  New York, New York
         March 1, 2023

                              WACHTEL MISSRY LLP

                              By: */s/Stella L. Sainty*
                              Steven J. Cohen
                              Stella L. Sainty
                              One Dag Hammarskjöld Plaza
                              885 Second Avenue, 47th Floor
                              New York, New York 10017
                              (212) 909-9500
                              scohen@wmllp.com
                              ssainty@wmllp.com

                              *Attorneys for Defendants/Counterclaim-*
                              *Plaintiffs SportLife Brands, LLC,*
                              *Blackview Capital LLC, Elie Levy, and*
                              *Michael Kassin*